UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 19-cr-00294-01 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| ORENTHA JAMES PEA (01) | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Orentha James Pea ("Defendant") is charged with two counts: Felon in Possession of a Firearm and Possession of a Firearm After Having Been Convicted of a Misdemeanor Crime of Domestic Violence. The charges arose after Defendant's estranged wife, Termekia Montgomery, called police following an altercation with Defendant.

Before the court is Defendant's Motion to Suppress. Doc. 21. Defendant argues that the search of his wife's home was illegal because police failed to obtain a warrant or valid consent. For the reasons that follow, it is recommended that Defendant's motion be denied.

**Factual Background**

An evidentiary hearing was held on January 17, 2020. Three witnesses testified: Officer Richard Pollitt of the Shreveport police department, ATF Task Force Officer Toby Morrison, and Defendant. The evidence at the hearing established the following facts.[1]

---

[1] Defendant objected that the Government did not call Ms. Montgomery as a witness. However, hearsay is permitted at a hearing on a motion to suppress. United States v. Lee, 541 F.2d 1145 (5th Cir. 1976). Two police witnesses who spoke multiple time with Ms. Montgomery testified, and

Defendant and his wife, Ms. Montgomery, are married and have eight children together, ranging from 7 to 18 years of age. In May 2018, Defendant and Ms. Montgomery rented the residence at 1121 Running Brook, Shreveport, Louisiana. Gov. Ex. 1. Both signed the lease. In December 2018, the lease was amended to remove Defendant's name and signature. Gov. Ex. 2.

Defendant was consistently violent and abusive towards Ms. Montgomery. For example, in 2005 Defendant shot Ms. Montgomery in the back when she was pregnant, which resulted in Defendant's conviction for aggravated battery.

On January 13, 2019, the day before the search in question, Defendant was riding as a passenger in Ms. Montgomery's SUV with two of their children in the backseat. Defendant began arguing with Ms. Montgomery, and he pulled out a pistol, placed it to Ms. Montgomery's head, and threatened to shoot her. The children in the backseat begged him not to do so.

At some point during that night or early on the morning of January 14, 2019, Defendant entered Ms. Montgomery's residence without her permission. Even though Defendant was removed from the lease and was not welcome in the house, he would sometimes enter through the windows or unlocked doors.

At some point that morning, Defendant asked Ms. Montgomery to take him to a corner store. She dropped him off and, instead of waiting for him, she left the store and

---

their testimony was generally consistent and reliable. It is understandable why she may not have wanted to testify. Furthermore, Defendant could have subpoenaed Ms. Montgomery if he believed her testimony was necessary to his standing argument or any other issue.

called 911.  Ms. Montgomery believed that Defendant returned to her residence after he left the store.  Because of that belief, she pulled into her driveway, but she waited in her SUV for police to arrive.

SPD Officers Pollitt and Medlin responded to Ms. Montgomery's call of assault and battery.  When they approached the residence, Ms. Montgomery exited her SUV and spoke with Officer Pollitt.  Ms. Montgomery appeared very frightened and upset.  She reported that her husband had threatened to blow her head off the previous day.  The officer noted that there were children in Ms. Montgomery's SUV.

Officer Pollitt and Officer Moore, who arrived separately, approached the garage door to the home and knocked.  Defendant came to the door, and the officers asked him to step outside.  During questioning, Defendant "played dumb" but did not deny any of the accusations.  One of the officers detained Defendant and put him in a patrol car.

Ms. Montgomery told the officers that she believed Defendant's gun may be in the residence.  Officer Pollitt asked Ms. Montgomery for consent to search the residence to look for the gun.  Ms. Montgomery gave him verbal consent. The gun was found in a small closet that housed an air conditioner unit.

Pollitt returned to his unit to retrieve his camera and a Victim Notification Rights Form and returned to the residence to fill out the form.  While doing so, Pollitt saw and heard Officer Moore present Ms. Montgomery with a written consent to search form.  Officer Pollitt, who was just a few feet away, saw Officer Moore at the kitchen counter explaining the form to Ms. Montgomery.  Pollitt also saw Ms. Montgomery sign the form.  The form, however, has not been located since.  Officer Moore now works in another state.

**Law and Analysis**

There are two legal issues before the court: (1) whether Defendant has standing to challenge the search of the residence, and (2) whether the Government proved that Ms. Montgomery consented to the search of her residence for the purpose of locating the handgun.

**Standing**

To claim the protection of the Fourth Amendment, a defendant must demonstrate "a legitimate expectation of privacy" in the place that was searched. Minnesota v. Carter, 525 U.S. 83, 119 S. Ct. 469, 472 (1998); United States v. Vega, 221 F.3d 789, 797–98 (5th Cir. 2000), abrogated on other grounds, as recognized in United States v. Aguirre, 664 F.3d 606, 611 n. 13 (5th Cir. 2011). To be legitimate, the expectation of privacy must be based "on a visit which represents a longstanding social custom that serves functions recognized as valuable by society." Vega, 221 F.3d at 798 (internal quotation marks omitted). For example, an overnight guest may claim the protection of the Fourth Amendment, but a visitor "merely legitimately on the premises" cannot. Carter, 119 S.Ct. at 474 (internal quotation marks omitted). In Carter, the Supreme Court concluded that two defendants who were invited into the home of another for the purpose of bagging cocaine had no legitimate expectation of privacy in light of "the purely commercial nature of the transaction engaged in [in the apartment], the relatively short period of time on the premises, and the lack of any previous connection between [the defendants] and the householder." Id; United States v. Rios-Davila, 530 Fed. Appx. 344 (5th Cir. 2013)

(invited visitor at residence did not have standing to challenge search that began when officers entered backyard without probable cause).

Defendant testified at the hearing in an attempt to establish his standing to object to the search. He testified that he was at his mother's house in Grand Cane, Louisiana on January 13, 2019. He stated that Ms. Montgomery called him and told him that she needed "wash money." Defendant admitted that Ms. Montgomery's request was for wash money and not for Defendant to spend the night at the residence.

Defendant also testified that he had previously told Ms. Montgomery that he "had someone else." According to Defendant, her response was: "If I can't have you, I'll kill you or have you in jail." Defendant concluded his testimony by stating, "Monday morning, I was in jail."

Defendant was removed from the lease a few months after it was signed. When Defendant did enter the home, he was not an invited guest and he often broke into the home. More to the point, Defendant was not an invited guest in the home on the day of the search. Accordingly, Defendant lacks standing to challenge the search that led to the discovery of the handgun.

**Consent**

Even if Defendant had standing to challenge the search of the home, Ms. Montgomery gave the police officers valid consent to search. "A search conducted pursuant to consent is excepted from the Fourth Amendment's . . . requirements." United States v. Solis, 299 F.3d 420, 436 (5th Cir. 2002). Where the government asserts that no search warrant was required because the officer obtained consent to search, the government

must prove by a preponderance of the evidence that consent was freely and voluntarily given.  United States v. Tompkins, 130 F.3d 117, 121 (5th Cir. 1997).  Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 93 S.Ct. 2041 (1973).  In evaluating the voluntariness of consent, the Fifth Circuit looks to six factors: (1) the voluntariness of the person's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the person's cooperation with the police; (4) the person's awareness of his right to refuse consent; (5) the person's education and intelligence; and (6) the person's belief that no incriminating evidence will be found.  United States v. Cavitt, 550 F.3d 430, 439 (5th Cir. 2008).  No single factor is dispositive or controlling.  Solis, 299 F.3d at 436.

The court finds that the police officers' testimony established the voluntariness of Ms. Montgomery's consent by a preponderance of the evidence.  Ms. Montgomery was not in custody; in fact, she called the police because she believed Defendant was in her residence with a handgun.  The officers used no coercive or improper tactics to obtain consent. Ms. Montgomery was very cooperative at all times.  She suspected there was a handgun in the home, and she wanted police to find it and remove it—obviously for the safety of her and her children.

There was credible testimony that another officer presented a written consent to search form to Ms. Montgomery, that the document was explained to her, and she signed it.  That form has never been found, but there was persuasive evidence that it was signed

and that Ms. Montgomery gave verbal consent. That evidence is sufficient to meet the Government's burden.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 21) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 29th day of January, 2020.



Mark L. Hornsby
U.S. Magistrate Judge